**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANTHONY P. TISONE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 16-167 |
| v. | ) | |
| | ) | Judge Cathy Bissoon |
| BILL BERARDINO AND ASCENT | ) | |
| AUTOMOTIVE GROUP, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

### I. MEMORANDUM

Pending before the Court is a motion (**Doc. 14**) by Defendants Bill Berardino

("Berardino") and Ascent Automotive Group-TM, L.L.C. ("Ascent")[1] to dismiss the First

Amended Complaint filed by Plaintiff Anthony P. Tisone ("Tisone"). For the reasons that

follow, Defendants' motion will be GRANTED in part and DENIED in part.

#### A. Factual and Procedural Background

Tisone held a managerial position at Toyota of Greensburg, a car dealership (at times

hereafter, the "dealership"), from 2009 until his termination on February 3, 2016. (First

Amended Complaint, "FAC," at ¶¶ 4, 14, 17-18, 101.) According to Tisone, the dealership was

sold to Ascent, a Texas Limited Liability Company, in October 2011. (Id. at ¶¶ 13, 15.) Despite

being employed *at* Toyota of Greensburg, Tisone maintains that he was always employed *by* a

different entity, which he alternatively identifies as the "Friedkin Group" and/or "Friedkin

Companies, Inc." (hereafter, "Friedkin"). (FAC at ¶¶ 11, 16, 106.) The relationship between

---

[1] The company is inaccurately designated "Ascent Automotive Group LLC" in the First
Amended Complaint.

1

Friedkin and Ascent is not spelled out in the FAC, except to the extent Tisone alleges that "Thomas Dan Friedkin is a Director of Ascent." (Id. at ¶ 103.)

As of April 2013, the dealership adopted a "Workplace Violence Policy" known as "HR-POL 111." (FAC at ¶¶ 108-109.) This policy stated, in relevant part, that: "Our Company is committed to providing a safe and secure workplace for all associates and business partners and will not tolerate workplace violence or threats of any kind, whether committed by or against our associates." (Id. at ¶ 110.) Under the policy, "everyone is responsible for preventing and reporting workplace violence." (Id. at ¶ 111.) Moreover, "anyone who believes that he or she has encountered or witnessed a threat or act of workplace violence must report the threat or act of workplace violence to the immediate supervisor or manager, Human Resources, Legal Department... [o]r a member of Senior Management." (Id. at ¶ 112.) Prohibited conduct included "[a]ctions intended to frighten or stalking," (see id. at ¶ 113), and "[p]hysical violence such as throwing objects, shoving, pushing, hitting, or kicking." (Id. at ¶ 114.) The policy applied "at all times" to "all[ ] [a]ssociates, independent contractors, part time, short schedule and temporary workers, vendors and those employed by others who have access to associates..." (Id. at ¶ 118.)

Tisone claims he was "always instructed that enforcement of the workplace violence policy [was] a critical part of his managerial duties. . . ." (FAC at ¶ 116.) To that end, he had previously been called upon to discipline employees for engaging in workplace violence, consistent with the terms of the policy. (Id. at ¶ 115.)

In June 2014, Tisone was promoted to General Manager for Toyota of Greensburg. (FAC at ¶¶ 17-18.) Shortly thereafter, Berardino[2] orchestrated a change in the dealership's ad agency. (Id. at ¶ 19.) This change resulted in fewer radio advertisements for Toyota of Greensburg and a drop in its new car sales. (Id. at ¶¶ 21-23.) Tisone made complaints to senior management about this drop off to no avail. (Id. at ¶24.)

Thereafter, Berardino made regular visits to Toyota of Greenburg. (FAC at ¶ 25.) On almost every occasion, he was verbally abusive to Tisone and other members of the dealership's staff. (Id. at ¶ 26.) At times, Berardino used profanity toward Tisone and Brian Geiger ("Geiger"), the dealership's general sales manager. (Id. at ¶¶ 27-29, 46-47, 50.) On one occasion, he accused Tisone, Geiger, and another staff member of inflating the dealership's sales numbers. (Id. at ¶¶ 30-31.) During a December 14, 2015 meeting, Tisone witnessed Berardino push Geiger against a wall and poke him in the chest after Geiger attempted to leave the meeting. (Id. at ¶¶ 51-52.) Tisone claims that, under the terms of the Workplace Violence Policy, he "had a duty to report Berardino's ongoing and consistent verbal abuse and his physical battery of Geiger." (Id. at ¶102.)

Based on "advice from Friedkin management," (FAC at ¶ 38), Tisone outlined Berardino's abuses in a letter to Marc Watts ("Watts"), President of the Friedkin Group. (Id. at ¶¶ 38, 40.) Tisone also wrote letters about Berardino's conduct to Ascent's "Financial Officer," Chris Hough ("Hough"), and its Chief Operations Officer, Lee Butler ("Butler"). (Id. at ¶ 43.) Thereafter, Hough and Butler had numerous conversations with Tisone and assured him that his letter would get into the right hands. (Id. at ¶¶ 44-45.) They advised Tisone to "hang in there" because Berardino's contract would terminate at the end of December 2015. (Id. at ¶ 48.)

---

[2] The FAC does not indicate what job position Berardino held vis-a-vis Tisone or the dealership; it states only that Berardino "was not an employee of Friedkin." (FAC at ¶ 19.)

Following the December 14, 2015 incident, Paige Larrabee ("Larrabee"), a senior lawyer at Friedkin Companies, Inc., contacted Tisone about reports of Berardino's abusive conduct. (FAC at ¶¶ 56-60.)  Tisone discussed with Larrabee his firsthand knowledge of Berardino's abusive behavior.  (Id. at ¶ 59.)  Tisone later learned that the matter had been referred to more senior corporate personnel.  (Id. at ¶ 80.)  He was also informed by Hough and Butler that Ascent was having a critical board meeting on February 1, 2016, at which time the issues about Berardino's behavior would be addressed.  (Id. at ¶ 84.)  Butler informed Tisone that the Ascent Board of Directors was fully aware of Berardino's behavior and that the situation should get better.  (Id. at ¶ 85.)

On February 3, 2016, Tisone received a call from L. Alexander McAllister ("McAllister"), Ascent's Chief Financial Officer, and the two made arrangements to meet.  (FAC at ¶¶ 92-95, 104.)  According to Tisone, "McAllister explained that Ascent had held a board meeting and neither the Board nor Central Atlantic Toyota were pleased with the 2015 Toyota Greensburg store performance and, as a consequence, they had made a decision to terminate [Tisone's] employment."  (Id. at ¶ 96.)  Tisone attempted to point out that, under his management, Toyota of Greensburg had become the number one dealership in the entire district for all of 2014 and 2015.  (Id. at ¶ 97.)  He claims he "told McAllister that the store had received nothing but praise from Toyota Central and from everyone at corporate except Berardino."  (Id. at ¶ 98.)  Tisone "pointed out that the Hyundai store, which was less than 1/8 of a mile away, and not under [Tisone's] management, had lost some $700,000 in one year and the General Manager at that store still retained his employment."  (Id. at ¶ 99.)  According to Tisone, neither McAllister nor the human resources representative that accompanied him were willing to discuss these points.  (Id. at ¶ 100.)  Instead, Tisone was fired.  (Id. at ¶ 101.)

On May 3, 2016, Tisone filed the FAC (Doc. 12), the operative pleading in this case. Therein, Tisone asserted claims against the Defendants for intentional interference with contractual relations (Counts I and II), intentional infliction of emotional distress (Count III), and breach of contract (Count IV). Defendants filed the instant motion (Doc. 14) on May 17, 2016, requesting a dismissal of all claims.

### B. Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). When faced with a motion to dismiss, a court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). See Henderson v. Borough of Baldwin, No. 15-1011, 2016 WL 5106945, at *2 (W.D. Pa. Sept. 20, 2016).

### C. Scope of Review

Generally, a district court may not consider matters outside of the complaint when ruling on a Rule 12(b)(6) motion to dismiss. "If, on a motion under Rule 12(b)(6)..., matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). There is an exception to this rule, however: for Rule 12(b)(6) purposes, courts may consider (i) exhibits that are attached to the complaint; (ii) matters of public record; and, (iii) any undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the document is integral to or explicitly relied upon in the complaint. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426

(3d Cir. 1997); <u>Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,</u> 998 F.2d 1192, 1196 (3d Cir. 1993).

In arguing the merits of the pending motion, both Defendants and Tisone rely on certain documents outside of the FAC. Certain of these materials are appropriate for consideration under Rule 12(b)(6) and others are not.

Defendants' "Exhibit 1" consists of the following: (A) a copy of the Fictitious Name Amendment that TM-Greensburg, L.L.C. filed with the Pennsylvania Department of State, indicating its intent to operate under the fictitious name "Toyota of Greensburg" (Doc. 15 at 20-23); (B) a copy of the Texas Franchise Tax Public Information Report that Ascent filed with the Texas Department of State, indicating its one-hundred percent (100%) ownership of TM-Greensburg, L.L.C. (Doc. 15 at 24-26); and (C) a document entitled "TM-Greensburg, L.L.C. Written Consent of the Sole Manager," which purports to establish Berardino as President of TM-Greensburg, L.L.C., effective September 1, 2015 (Doc. 15 at 27-29). The first two documents are public records whose content may be judicially noticed and properly considered under Rule 12(b)(6). <u>See</u> <u>Schmidt v. Skolas</u>, 770 F.3d 241, 249 (3d Cir. 2014) (court may consider matters of public record on a Rule 12(b)(6) motion; Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). The third document appended to Exhibit 1– <i>i.e.,</i> TM-Greensburg, L.L.C.'s "Written Consent of the Sole Manager" -- is not one that has been publicly filed as far as this Court can tell, nor can its contents be judicially noticed. Tisone also disputes the authenticity of this document, at least insofar as the date of its execution is concerned. Although the exhibit is

potentially relevant to Tisone's claims, it is not intrinsic to his claims. Accordingly, the Court will not consider Defendants' Exhibit 1-C in disposing of the pending motion.

Defendants also proffer three additional exhibits numbered 2 through 4. Exhibit 2 is a copy of a letter, ostensibly signed by Tisone on October 1, 2011, wherein he acknowledged and accepted an offer of employment by "TM-Greensburg, L.L.C." (Doc. 15 at 30-32.) Defendants' Exhibit 3 is a copy of certain policies pertaining to "Employment at Will" and "Workplace Violence." (Doc. 15 at 33-39.) Defendants' Exhibit 4 consists of documents that Tisone signed in 2009 and 2013 acknowledging and certifying his receipt and understanding of various employment-related policies and procedures. (Doc. 15 at 40-44.)

For purposes of the pending motion to dismiss, the Court may consider the Workplace Violence Policy, dated April 1, 2013, which is appended as part of Defendants' Exhibit 3. In Count IV of the FAC, Tisone asserts a claim for breach of an implied employment contract based on the contents of the Workplace Violence Policy. His theory is that the policy constitutes a term of his employment and, to that end, he quotes certain portions of the policy directly in the FAC. Because Tisone expressly references and relies upon the provisions of the Workplace Violence Policy in Count IV, the Court may review the policy document without the necessity of converting Defendants' Rule 12(b)(6) motion into a motion for summary judgment. See In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1426 (a "document integral to or explicitly relied upon in the complaint" may be considered "without converting the motion [to dismiss] into one for summary judgment").

The Court will not accept or consider the remainder of defense Exhibits 2 through 4 at this time. These documents are not matters of public record which can be judicially noticed, nor did Tisone rely on them in framing his pleading. See Schmidt, 770 F.3d at 249 ("'[W]hat is

critical is whether the claims in the complaint are based on an extrinsic document and not merely whether the extrinsic document was explicitly cited.'") (quoting <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d at 1426); <u>see id.</u> at 250 (documents were not integral to the complaint and could not be considered under Rule 12(b)(6) where the complaint was not "based" on them). Moreover, the "Employment at Will" policy included within Defendants' Exhibit 3 is dated July 5, 2005, and there is nothing of record to establish that this policy was in force during the time frame relevant to Tisone's claims. Therefore, the Court will not consider the foregoing documents in its analysis.

In response to Defendants' motion to dismiss, Tisone has submitted three exhibits of his own. Exhibit 1 is a copy of his W-2 forms for tax years 2013, 2014, and 2015. (<u>See</u> Doc. 17-1.) Exhibit 2 is a "LinkedIn" page for "William Berardino." (<u>See</u> Doc. 17-2.) Exhibit 3 is a copy of Toyota of Greensburg's "Policies and Procedures," including HR-POL 111 (the "Workplace Violence Policy"), HR-POL 112, pertaining to "Safety and Workplace Compliance," and HR-POL 113, pertaining to "Constructive Discipline." (<u>See</u> Doc. 17-3.)

For the reasons discussed above, the Court can consider the Workplace Violence Policy appended as Tisone's Exhibit 3 without the need to convert the pending motion into a Rule 56 motion for summary judgment. To the extent Tisone claims that the Workplace Violence Policy created implied terms of employment, it is appropriate to consider the actual terms of the policy.

The Court will also consider Tisone's W-2 information. In his FAC, Tisone expressly alleges that his "W-2 form and payroll checks indicate he is and has always been an employee of the Friedkin Group." (FAC at ¶ 106.) Because Tisone expressly relies on this information in framing his claims, the documentation may properly be considered in the Court's 12(b)(6) analysis.

On the other hand, the Court will not consider the remainder of Tisone's exhibits. The "LinkedIn" page appended as Tisone's Exhibit 2 constitutes hearsay evidence and is not within the parameters of material that can properly be considered under Rule 12(b)(6). There is no unfair prejudice to Tisone in this regard, because the "LinkedIn" page was submitted to rebut the evidence set forth in Defendants' Exhibit 1-C, and this Court is not considering the latter exhibit in connection with the pending motion. The other employment-related policies appended at Exhibit 3 are not directly germane to Tisone's claims; they also were not referenced in the FAC, nor do they form any part of his breach of contract claim.

Accordingly, for purposes of its legal analysis, the Court accepts into the record Defendants' Exhibits 1-A and 1-B, Tisone's Exhibit 1, and the "Workplace Violence Policy" which each side submitted as part of their respective "Exhibit 3."

**D. Legal Analysis**

*1. What Entity Employed Tisone?*

As a predicate to its Rule 12(b)(6) analysis, the Court must address the question of what entity or entities actually employed Tisone. Although Tisone acknowledges that he worked *at* Toyota of Greensburg (FAC at ¶ 14), he alleges in the FAC that he was employed *by* an entity variously referred to as the "Friedkin Group" (Id. at ¶ 11) and/or "Friedkin Companies Inc." (Id. at ¶ 16). Tisone supports this averment by pointing to his W-2 forms which, he claims, "show that [he] was employed only by the Friedkin Companies Inc., and by no other entity." (Br. Opp. Mot. Dismiss at 10, Doc. 17; see also FAC at ¶ 106; Pl.'s Ex. 1, Doc. 17-1.)

For purposes of its Rule 12(b)(6) analysis, this Court can disregard any conclusory allegations in the FAC. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). Here, Tisone's W-2 forms show only that "Friedkin Companies Inc." was listed as Tisone's

"Employer" in its capacity as "Common Pay Agent for TM-Greensburg LLC." (Doc. 17-1.)

Further, Defendants' Exhibit 1-A establishes that TM-Greensburg, L.L.C. was registered, as of

October 3, 2011, to do business as Toyota of Greensburg. (Doc. 15 at 21-22.) Tisone admits

that he worked at the Toyota of Greensburg dealership (FAC ¶ 14), and the Workplace Violence

Policy at issue in this case was a policy issued by "Toyota of Greensburg." (Doc. 17-3.) Thus,

based on the Rule 12(b)(6) record in this case, it appears that Tisone's employer during the time

period in question was TM-Greensburg L.L.C. Tisone's contrary allegations that he was

employed by the "Friedkin Group" and/or "Friedkin Companies Inc." are conclusory and

implausible. They will therefore be disregarded.

### 2. *Breach of Implied Contract of Employment*

The Court will next address Tisone's claim for breach of implied contract of

employment, which is set forth in FAC Count IV. The gravamen of Tisone's theory is that the

Workplace Violence Policy was a material condition of his employment inasmuch as he was

obligated to enforce its terms. (FAC at ¶¶ 148-49.) He claims that Defendants breached his

"implied employment contract" when they "not only [failed to] enforce the Policy as stated, but

terminated [him] for attempting to enforce it." (Id. at ¶ 151.)

To establish a breach of contract claim under Pennsylvania law, a plaintiff must

demonstrate: (1) the existence of a contract, including its essential terms; (2) breach of a duty

imposed by the contract; and (3) resulting damages. Pa. Supply Inc. v. American Ash Recycling

Corp., 895 A.2d 595, 600 (Pa. Super. Ct. 2006). It is axiomatic that "[a] defendant can only be

liable for breach of a contract if it is a party to that contract." CMF Assocs., LLC v. Scout

Media, Inc., Civil Action No. 15-01250, 2015 WL 2125131, at *2 (E.D. Pa. May 6, 2015)

(internal quotation marks and citations omitted). Tisone's breach of contract theory is misplaced

insofar as it is asserted against Berardino because the FAC does not allege any contractual relationship between Tisone and Berardino, employment-related or otherwise. The claim against Berardino will therefore be dismissed.

Tisone's breach of contract claim against Ascent is more muddled, but it is ultimately deficient for the same reason. Here, the evidence of record demonstrates that: (a) Tisone's employer during the relevant time-frame was TM-Greensburg, L.L.C., and (b) the latter entity is wholly-owned by Ascent (which is also an LLC). As a general matter, Pennsylvania treats artificial entities such as corporations and limited liability companies ("LLCs") as legally distinct and separate from their shareholders or members. See Commonwealth of Pa. Dep't. of Envtl. Prot. v. Trainer Custom Chem. LLC, Civil Action No. 15-1232, --- F. Supp. 3d ---, 2016 WL 4525451, at *10 (Aug. 30, 2016) [WHERE IS THIS CASE FROM?] ("As a general rule, members of a limited liability company or shareholders of corporations are not personally liable to perform corporate obligations.") (internal footnote, quotation marks, and citation omitted); Gerstadt v. Lehigh Valley Infectious Disease Specialists, Civil Action No. 08-4869, 2009 WL 839092, at *6 (E.D. Pa. Mar. 30, 2009) ("Even where a corporate parent has near-total control over a subsidiary, courts have declined to adopt a *per se* rule stating that the parent and subsidiary are one entity.") (citing Nat'l Data Payment Sys. v. Meridian Bank, 212 F.3d 849, 856 (3d Cir. 2000)); Shared Commc'ns Servs. of 1800-80 JFK Blvd. v. Bell Atl. Prop., Inc., 692 A.2d 570, 573 (Pa. Super. Ct. 1997) ("Although a parent and a wholly owned subsidiary do share common goals, they are still recognized as separate and distinct legal entities."). "Under Pennsylvania law, there is a strong presumption in favor or respecting the veil of an artificial entity." In re Pocius, 556 B.R. 658, 671 (Bankr. E.D. Pa. Aug. 29, 2016). See also Advanced Tel. Sys., Inc. v. Com-Net Prof'l Mobile Radio, LLC, 846 A.2d 1264, 1277 (Pa. Super. Ct. 2004)

("[T]here is a strong presumption in Pennsylvania against piercing the corporate veil.") (quoting Lumax Industries, Inc. v. Aultman, 669 A.2d 893, 895 (Pa. 1995))(alteration in the original).

Nevertheless, in certain circumstances, courts will disregard the corporate structure. For example, a corporate shareholder or LLC member can sometimes be held liable for the claims or debts of the entity under the "alter ego" theory, which applies when the entity's "'affairs and personnel were manipulated to such an extent that it became nothing more than a sham used to disguise the [owner's] use of its assets for [the owner's] own benefit in fraud of its creditors.'" Trainer Custom Chem. LLC, 2016 WL 4525451, at *11 (quoting Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1521 (3d Cir. 1994)). See also In re Pocius, 556 B.R. at 671 (noting that courts will set aside the "strong presumption" in favor or shielding LLC members from liability for the obligations of their entity when necessary to "prevent fraud, illegality, or injustice, or when recognition of the ... entity would defeat the public purpose or shield someone from a liability for a crime.") (internal quotation marks and citation omitted). Factors that can support a court's decision to disregard the corporate form include: undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs, and use of the corporate form to perpetuate a fraud. See Advanced Tel. Sys., Inc. v. Com-Net Prof'l Mobile Radio, LLC, 846 A.2d 1264, 1278 (Pa. Super. Ct. 2004)) (quoting Good v. Holstein, 787 A.2d 426, 430 (Pa. Super. Ct. 2001) and Lumax Indus., Inc. v. Aultman, 669 A.2d 893, 895 (Pa. 1995)).

In this case, the FAC is completely ambiguous concerning the dealership's corporate structure and the relationship between and among "Friedkin," Ascent, and TM-Greensburg, L.L.C. While Tisone maintains that he was employed by Friedkin, this averment is implausible in light of the current record, which shows that TM-Greensburg, L.L.C. was at least the nominal

employer. Significantly, however, Tisone has not named TM-Greensburg, L.L.C. as a defendant in his breach of contract claim; instead, he has named Ascent -- the "parent" LLC of TM-Greensburg, LLC. Although Tisone's averments suggest that Ascent had some degree of control concerning his employment, Tisone has not alleged that Ascent acted as TM-Greensburg, L.L.C.'s "alter ego." Thus, the FAC contains no averments that would justify disregarding the corporate structure that renders Ascent and its wholly-owned LLC distinct, legal entities. As currently pled, Count IV of the FAC fails to allege a plausible contractual relationship between Tisone and Ascent.[3] Accordingly, Count IV will be dismissed without prejudice.

### 3. Intentional Interference with Contractual Relations

In Counts I and II of the FAC, Tisone asserts claims against Berardino and Ascent, respectively, for intentional interference with contractual relations. To establish such a claim, Tisone must demonstrate: (1) an existing contractual relationship; (2) the defendant's purposeful or intentional interference with the performance of that contract by inducing a breach or otherwise causing the third party not to perform; (3) the defendant's lack of privilege to interfere; and (4) pecuniary loss resulting from the breach of contract. Aetna, Inc. v. Health Diagnostic Lab. Inc., No. CV 15-1868, 2015 WL 9460072, at *5 (E.D. Pa. Dec. 28, 2015). The defendant cannot be liable if he is a party to the contract in question. See Daniel Adams Assocs., Inc., v. Rimbach Pub., Inc., 519 A.2d 997, 1000 (Pa. Super. Ct. 1987) ("Essential to a right of recovery under this section is the existence of a contractual relationship between the plaintiff and a "third

---

[3] Defendants argue that Count IV is deficient for another reason: namely, Tisone was an "at will" employee and the Workplace Violence Policy could not have conferred any contractual rights upon him. The Court will not address this argument at present because it has found the claim to be deficient on more fundamental grounds, and because Defendants' argument relies on exhibits that have not been accepted for purposes of the Court's Rule 12(b)(6) analysis. Nevertheless, having been served with Defendants' exhibits, Tisone will need to consider whether, in light of such evidence, he can re-assert his breach of contract claim in good faith, consistent with the requirements of Rule 11.

person" other than the defendant. . . . By definition, this tort necessarily involves three parties. The tortfeasor is one who intentionally and improperly interferes with a contract between the plaintiff and a third person.") (internal citations omitted).

Defendants contend that they cannot be liable because they were not third parties to the employment relationship in question and/or they were privileged to interfere with said relationship. Alternatively, they contend that Counts I and II fail as a matter of law because Tisone was employed "at will" and Pennsylvania does not recognize a cause of action for the intentional interference with an at-will employment relationship. Having fully considered these arguments, the Court is not persuaded that a dismissal of Counts I and II is warranted at this time. Accordingly, Defendants' Motion will be denied as to Counts I and II.

     a)  <u>Tisone's Claim Against Ascent</u>

In Count II of the FAC, Tisone alleges that Ascent interfered with his employment by forcing or inducing his termination in retaliation for his complaints about Berardino violating the dealership's Workplace Violence Policy. (FAC at ¶¶ 133-38.) The Court will assess the viability of this theory in light of the evidence showing that Tisone was employed by TM-Greensburg, L.L.C.

Defendants contend that, as a matter of law, Ascent could not have interfered with the contractual relationships of its wholly-owned LLC. As discussed, however, Pennsylvania presumptively treats an LLC as an entity separate and distinct from its members. While this presumption works *against* Tisone for purposes of his breach of contract claim, it operates *in his favor* to the extent he has to establish that Ascent acted as a third party to his employment relationship with TM-Greensburg, L.L.C. Construing the FAC in the light most favorable to

Tisone, the Court finds that the FAC adequately alleges Ascent's status as a third-party to the underlying employment relationship. Defendants' motion to dismiss on this basis will be denied.

### b) Tisone's Claim Against Berardino

Count I of the FAC asserts a similar tortious interference claim against Berardino based on the theory that Berardino induced the "Friedkin Group" to terminate his employment. (FAC at ¶¶ 121-22.) Tisone claims that Berardino acted not in the interests of the "Friedkin Group" but out of malice, in retaliation for the complaints Tisone made concerning Berardino's violations of the Workplace Violence Policy. (Id. at ¶ 123.)

As with Tisone's other claims, the Court will disregard the implausible allegation that Friedkin employed him; and instead, the Court will address the viability of the claim in light of evidence that TM-Greensburg L.L.C. employed Tisone. Proceeding on this basis, Defendants argue that Berardino cannot be liable because, as an agent of Tisone's employer, Berardino was privileged to interfere with the employment relationship in question.

Under Pennsylvania law, an agent cannot be liable for tortiously interfering with his principal's contract, so long as he is acting within the scope of his authority. CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc., 357 F.3d 375, 385 (3d Cir. 2004) ("The actions of a principal's agent are afforded a qualified privilege from liability for tortious interference with the principal's contract.") (citing authority). "The reason for this privilege is that holding an agent liable would be like holding the principal itself liable for the tort of interfering with its own contract, instead of holding the principal liable for breach of contract." Id. "Conversely, an agent may be liable for tortious interference, just as if the agent were an outside third party, if the allegedly interfering acts were conducted outside the scope of the agent's authority." Id. (citation

omitted); see also St. Germain v. Wisniewski, No. 15-1279, 2016 WL 4158994, at *7 (W.D. Pa. Aug. 5, 2016) ("A corporation's agents are awarded no privilege when operating outside of the scope of their authority; conversely, when operating within the scope of their authority, they are entitled to privilege.").

A number of district court cases interpreting Pennsylvania law have suggested that an agent acts outside the scope of his employment when the "sole motive in causing the corporation to breach the contract is actual malice toward the plaintiff, or if the officer's conduct is against the corporation's interest." Duran v. Cty. of Clinton, No. 4:14-CV-2047, 2015 WL 5675580, at *11 (M.D. Pa. Sept. 25, 2015) (citing cases). While allegations of improper motive are not dispositive of the issue, id., several courts have found allegations of personal animus, malice or retaliatory motive sufficient at the Rule 12(b)(6) stage to state a claim for tortious interference with a contract. See, e.g., Duran, 2015 WL 5675580, at *11 (plaintiff stated claim based on allegations that individual defendants "acted with malicious and/or reckless disregard," "conspired and acted with the intention of causing the Plaintiff to be falsely and wrongfully terminated from his employment," and "had no purpose other than the wrongful interference in and termination of Plaintiff's contractual relationship with the [employer]"); Hall v. Easton Area Sch. Dist., No.10–7603, 2012 WL 526287, at *8 (E.D. Pa. Feb.17, 2012) (finding allegations of personal, intentional, and retaliatory action sufficient in motion to dismiss context); Whaumbush, 747 F. Supp. 2d at 513 (finding allegations of intentional and malicious conduct sufficient at motion to dismiss stage); Rocking Horse Child Care Ctrs. of Am., Inc. v. Carneal, No. 94–7606, 1995 WL 216947, at *5 (E.D. Pa. Apr.11, 1995) (same).

Here, the FAC does not affirmatively specify what position, if any, Berardino held vis-a-vis TM-Greensburg, L.L.C. or Ascent, nor does it address the scope of Berardino's

authority relative to Tisone. Nevertheless, it can reasonably be inferred from Tisone's averments that Berardino held some type of supervisory position within the dealership's corporate hierarchy.[4]

The Court finds that Tisone has sufficiently alleged that Berardino acted outside the scope of his employment by engaging in conduct that was contrary to the employer's interests and motivated solely by his malice toward Tisone. The dealership's Workplace Violence Policy sets forth the company's "commit[ment] to providing a safe and secure workplace for all associates" and its "[intolerance of] workplace violence or threats of any kind, whether committed by or against our associates." (Defs.' Ex. 3, Doc. 15 at 38.) To that end, the policy makes clear that it is "each associate's and business partner's responsibility to prevent and report workplace violence." (Id.) Tisone claims that Berardino "acted in his own selfish capacity" by inducing the company to terminate Tisone's employment. (FAC at ¶ 122.) Tisone insists this "was not done in the interests of [the employer] but out of Berardino's malice in retaliation for the justified and corroborated complaints [Tisone] had made about his behavior including his battery and restraint of Geiger." (Id. at ¶ 123; see also id. at ¶ 128 (alleging that "Berardino, in choreographing the termination of Plaintiff, did so maliciously and for his own retaliatory satisfaction and not for any business interest.").)

In sum, the Court is satisfied that Tisone has pleaded facts which, if proven, would establish that Berardino acted outside the scope of his employment and without privilege when he allegedly interfered with Tisone's employment relationship. Defendants' motion to dismiss Count I on this basis will be denied.

_____

[4] As previously discussed, the Court will not presently consider Defendants' evidence that Berardino was the president of TM-Greensburg, L.L.C. because the authenticity of Defendants' exhibit is disputed.

c) "At-Will" Employment

Alternatively, Defendants argue that Counts I and II must be dismissed because Tisone was employed on at "at-will" basis and Pennsylvania does not recognize a cause of action for the intentional interference with an at-will employment relationship.  The federal and state courts in this Commonwealth are currently divided on the issue of whether such a cause of action exists. Compare Mifflinburg Tel., Inc. v. Criswell, 80 F. Supp. 3d 566, 572 (M.D. Pa. 2015) ("[I]t is the considered view of this Court that the current state of Pennsylvania law does not allow tortious interference claims based on at-will employment contracts."), and Hennessy v. Santiago, 708 A.2d 1269 (Pa.Super.1998), ("[A]n at-will employee cannot allege the tort of intentional interference with contractual relations unless his or her employment is prospective."), with Mason Range Resources-Appalachia, LLC, Civil Action No. 12-369, 2012 WL 2116969, at *7 (R&R) (W.D. Pa. May 9, 2012) (predicting that "the Pennsylvania Supreme Court would recognize a cause of action for tortious interference with an existing, at-will employment relationship"), and Dowling v. Pa. Psychiatric Inst., No. 473 MDA 2014, 2015 WL 7016337, at *6 (Pa. Super. Ct. June 8, 2015) ("'[A]n action for intentional interference with the performance of a contract lies even though the contract interfered with is terminable at the will of the parties.'").

The Court need not resolve this question issue at present.  As noted herein, Defendants' "at will" argument is based on several exhibits that have not been accepted by the Court for purposes of its Rule 12(b)(6) analysis.  Moreover, given the Court's disposition of Count IV, it remains to be seen whether Tisone can successfully allege the existence of a non-"at will" employment contract.  To the extent this issue remains a relevant basis for disposition of Counts I and II, it may be revisited at a subsequent procedural juncture.  For present purposes,

Defendants' motion to dismiss will be denied without prejudice insofar as it relates to Counts I and II of the FAC.

### 4. Intentional Infliction of Emotional Distress

In Count III of the FAC, Tisone asserts a claim against Berardino and Ascent for intentional infliction of emotional distress ("IIED"). Defendants argue that Tisone's IIED claim is preempted by the Pennsylvania Workers' Compensation Act ("PWCA"), 77 Pa. Cons. Stat. Ann. § 1, et seq. (West). They further argue in the alternative that Tisone has failed to allege the type of misconduct that is required in order to state an IIED claim.

To allege a valid IIED claim, a plaintiff must establish that the defendant's conduct was: (1) extreme and outrageous; (2) intentional or reckless; and (3) the cause of severe emotional distress to the plaintiff. Denithrone v. Ingernie, No. 15-5220, 2016 WL 724941, *3 (E.D. Pa. Feb. 24, 2016) (citing Manley v. Fitzgerald, 997 A.2d 1235, 1241 (Pa. Commw. Ct. 2010)). Pennsylvania law also requires the plaintiff to demonstrate that he suffered some type of "physical injury, harm or illness related to the distress." Connearney v. Main Line Hospitals, Inc., No. 15-2730, 2015 WL 9302912, *7 (E.D. Pa. Dec. 22, 2015).

"The PWCA bars IIED claims that arise out of an employment relationship." Ahmed v. Lowe's Home Ctrs., Inc., 346 F. App'x 816, 821 (3d Cir. 2009) (citing Matczak v. Frankford Candy & Chocolate Co., 136 F.3d 933, 940 (3d Cir.1997)). "There is, however, a narrow personal animus exception where the alleged injury was motivated by personal reasons as opposed to generalized contempt or hatred *and did not arise in the course of employment*." Id. (citing 77 Pa. Stat. Ann. § 411; Fugarino v. Univ. Servs., 123 F. Supp. 2d 838, 844 (E.D. Pa. 2000)) (emphasis added).

In Count III of the FAC, Tisone alleges that the Defendants intentionally inflicted emotional distress upon him when they "forced or induced" Tisone's employer to fire him based on Tisone's actions in enforcing the Workplace Violence Policy.  (FAC at ¶143.)  Tisone asserts that the Defendants' actions were "outrageous" in that they terminated his employment after requiring him to enforce the policy.  (Id. at ¶¶ 144, 147.)  Based on these allegations, it is clear that Tisone's IIED claim arises from his employment.  Accordingly, his claim does not fall within the ambit of the "personal animus" exception to the PWCA.

In his brief in opposition, Tisone argues that "Pennsylvania courts appear most likely to find that workplace conduct falls within the personal animus exception when the conduct involves physical violence, harm, or threats thereof."  (Pl.s' Br. Opp. Mot. Dismiss at 15, Doc. 17) (citing Price v. Phila., 790 F. Supp. 97, 100 (E.D. Pa. 1992)).  Tisone insists that such circumstances are present here, because "the actions of Berardino involve both physical violence and consistent verbal abuse to both Brian Geiger and to Plaintiff."  (Id.)  Further, "Berardino's physical violence towards Brian Geiger manifested a personal animosity which was immediately transferred to the Plaintiff once Plaintiff reported it and continued to report it."  (Id. at 15-16 (citing Gillespie v. Vecenie, 436 A.2d 695, 697 (Pa. Super. Ct. 1981), and Mike v. Borough of Aliquippa, 421 A.2d 251, 255 (Pa. Super. Ct. 1980)).

This argument fails for two reasons.  First, Tisone did not base his IIED claim on any physical or verbal abuse perpetrated by Berardino; rather, as noted above, the IIED claim is premised on the Defendants' alleged role in bringing about a retaliatory termination of Tisone's employment.  (See FAC at ¶¶ 143-148.)  Second, even if we were to accept Tisone's re-characterization of his IIED claim, it is clear that the alleged physical and verbal abuse arose in the course of, and related exclusively to, Tisone's employment.  See McComb v. Morgan

Stanley & Co., Inc., Civil Action No. 07-1049, 2007 WL 4150786, at *7 (W.D. Pa. Nov. 19, 2007) ("Pennsylvania law presumes that an injury is work related when it occurs on the employer's premises."); Hancuff v. Prism Tech. and Assemblies, 357 F. Supp. 828, 832 (W.D. Pa. 2005) ("'Where the animosity between the third party and the injured employee is developed because of work-related disputes, the animosity is developed because of the employment, and the injured employee's remedy is exclusively under the [PWCA].'") (quoting Abbott v. Anchor Glass Container Corp., 758 A.2d 1219, 1224 (Pa. Super. Ct. 2000)). To the extent the cases cited by Tisone persuasively support application of the "personal animus" exception, each is distinguishable in that they involved violence, physical harm, or threats thereof directed at the plaintiff[5]; none of the cited cases mirror the situation here, where the plaintiff merely witnessed an act of physical aggression against a coworker and was then allegedly fired for reporting it.

In addition, even if the PWCA did not bar Count III, the Court would be compelled to dismiss the claim based on Tisone's failure to plead sufficiently outrageous conduct. In Pennsylvania, recovery for IIED is limited to those circumstances in which the defendant acted in a manner "so extreme in nature as to go beyond all possible bounds of decency such that it would be regarded as utterly intolerable to civilized society." Regan v. Twp. of Lower Merion, 36 F. Supp. 2d 245, 251 (E.D. Pa. 1999)(citing Mulgrew v. Sears Roebuck & Co., 868 F. Supp. 98, 103 (E.D. Pa. 1994)); see also Matczak v. Frankford Candy & Chocolate Co., 136, F.3d 933 940 (3d Cir. 1997). It is "extremely rare to find conduct in the employment context that will rise

---

[5] See, e.g., Price, 790 F. Supp. at 100 (IIED claim was not barred by PWCA where plaintiff claimed his coworkers used racial epithets in his presence, threatened to "bury [a] hammer" in his head, told plaintiff that he could be "wiped out," and tied a deer head to the hood of plaintiff's car); Gillespie, 436 A.2d at 697 (claim for common law trespass not barred where plaintiff and coworker/assailant had an altercation over the procedure for "punching out," and assailant then followed plaintiff into the parking lot and attacked plaintiff verbally and physically); Mike, 421 A.2d at 255 (PWCA did not bar trespass claim by police officer who alleged he was beaten by fellow officers).

to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." Nayak v. Voith Turbo, Inc., No. 14-1053, 2016 WL 860664, *3 (M.D. Pa. Mar. 7, 2016)(citing Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1988) ("[T]he only instances in which courts applying Pennsylvania law have found conduct outrageous in the employment context is where an employer engaged in both sexual harassment and other retaliatory behavior against an employee.")).

Here, the alleged misconduct by Defendants – i.e., "forcing" or "inducing" Tisone's termination – is insufficient to support an IIED claim. "[W]hile a loss of employment is unfortunate and unquestionably causes hardship, often severe, it is a common event and cannot provide a basis for recovery for IIED." McComb, 2007 WL 4150786, at *8 (internal quotation marks and citation omitted).

Berardino's alleged verbal abuse of Tisone also falls short of the standard required to make out a viable IIED claim. See, e.g., Remp v. Alcon Lab., Inc., Civil Action No. 13-6407, 2016 WL 1161616, at * 9 (E.D. Pa. Mar. 24, 2016) (plaintiff failed to allege sufficiently extreme and outrageous conduct where she claimed that, after she made reasonable complaints of sex discrimination, human resources director subjected her to insults and threats, including the threat that plaintiff's employer would file a retaliatory defamation suit against her); Nayak, 2016 WL 860664, at *4 (plaintiff failed to state an IIED claim, despite alleging that one coworker banged his hand and yelled "this is no fucking retaliation," grabbed plaintiff by the shirt cuff at work, shoved plaintiff by the shoulder, and twice hit plaintiff on the neck; plaintiff also claimed that he and another coworker shopped for a gun at Walmart during their lunch break, after which the coworker allegedly pointed the gun at plaintiff and stated that he "need[ed] the gun to keep [Plaintiff] away"); Jafar v. Wells Fargo Bank, N.A., No. 14-6411, 2015 WL 1781703, *3 (E.D.

Pa. Apr. 15, 2015)(dismissing IIED claim where the plaintiff alleged that her supervisor made derogatory comments about her religious beliefs and ethnic background and mocked her alleged disability); Rorrer v. Cleveland Steel Container, 712 F. Supp. 2d 422, 439 (E.D. Pa. 2010) ("Push[ing] a utility knife into [female employee's] breast" not sufficient "to support a claim for intentional infliction of emotional distress"); Hoy v. Angelone, 720 A.2d 745, 755 (Pa. 1998) (finding workplace harassment involving sexual propositions, physical contact, frequent profanity, and "posting of a sexually suggestive picture" not sufficiently outrageous to support an IIED claim).

Moreover, Count III additionally fails to state a viable IIED claim insofar as the FAC does not allege that Tisone suffered some type of physical injury, harm or illness related to the emotional distress. See Connearney, 2015 WL 9302912, at *7. At best, Tisone offers the conclusory allegation that Defendants' actions "caused severe emotional distress to Plaintiff." (FAC at ¶ 145.) The claim is not supported by any factual averments that Tisone suffered physically as a result of Defendants' conduct. Consequently, Tisone has not stated a plausible IIED claim. See McComb, 2007 WL 4150786, at *8 (plaintiff failed to state an IIED claim where he merely alleged that defendant's actions caused him to suffer severe emotional distress and failed to alleged any supporting medical evidence or related physical harm).

## 5. Amendment

The United States Court of Appeals for the Third Circuit has held that before dismissing a case for failure to state a claim, a court must give the plaintiff an opportunity to amend the complaint, whether or not the plaintiff has asked to do so, unless it would be inequitable or futile. See Fletcher–Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 251 (3d Cir. 2007) (citing Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004)). Based on the analysis set forth

above, it does not appear that the defects in Count III of the FAC can be cured through further amendment. Accordingly, that claim will be dismissed with prejudice.

On the other hand, it is unclear at this juncture whether further amendment would be futile with respect to Count IV. The Court will therefore dismiss that claim without prejudice so that Tisone may attempt to re-plead his breach of contract claim, to the extent he can do so consistently with the principles discussed in herein and the mandates of Rule 11 of the Federal Rules of Civil Procedure.

## II. ORDER

For the reasons stated above, Defendants' Motion to Dismiss the First Amended Complaint Under Federal Rule of Civil Procedure 12(b)(6) for Failure to State a Claim Upon Which Relief Can be Granted (**Doc. 14**) is **GRANTED** with respect to Counts III and IV and **DENIED** as to Counts I and II. Count III is DISMISSED WITH PREJUDICE and Count IV is DISMISSED WITHOUT PREJUDICE. Should Plaintiff wish to replead Count IV, he may do so by filing an amended complaint on or before January 3, 2017. The failure to file an amended complaint will result in the immediate dismissal of Count IV, with prejudice.[6]

IT IS SO ORDERED.

---

[6] Given that Plaintiff already once has amended his pleadings, he must be prepared to make a last, best effort to state a viable claim, as the Court will not afford further opportunity for amendment. See Taylor v. Pilewski, 2008 WL 4861446, *3 (W.D. Pa. Nov. 7, 2008) ("[the c]ourt need not provide endless opportunities" for amendment, especially where such opportunity already has been enjoyed); Houser v. Postmaster Gen. of U.S., 573 F. App'x 141 (3d Cir. 2014) (affirming the Court's dismissal of a plaintiff's second amended complaint with prejudice, where the Court found that "[i]t [] would be inequitable to require Defendant, who already once has exhaustively and successfully defended Plaintiff's grievances, to respond to a continuous stream of formal and informal attempted amendments").

December 22, 2016                    <u>s/ Cathy Bissoon</u>
                                     Cathy Bissoon
                                     United States District Judge


cc (via ECF email notification):

    All Counsel of Record